459 So.2d 1089 (1984)
Barry BONIFAY, City of Pensacola, Daniel Thomas Bowen and Mary Catches Bowen, Appellants,
v.
Barry E. DICKSON and John R. Williams, Appellees.
No. AZ-138.
District Court of Appeal of Florida, First District.
November 1, 1984.
Rehearing Denied November 30, 1984.
*1091 John B. Carr of Barnes & Carr, Pensacola, for appellant Bonifay.
John W. Fleming, Asst. City Atty., Pensacola, for appellant City of Pensacola.
John P. Welch of Jones & Welch, Pensacola, for appellants Daniel Thomas Bowen and Mary Catches Bowen.
Artice L. McGraw of Cetti, McGraw, Bearman & Eddins, Pensacola, for appellees.
BARFIELD, Judge.
Appellants challenge a final judgment quieting title in Dickson and Williams who, it is asserted, have failed to show the validity of their title. In addition, appellants contend that the trial court failed to recognize public and private interests in the disputed property. We agree and reverse.
This case is another in a series of disputes over the ownership of sections of a strip of waterfront property in a residential development known as East Pensacola Heights.[1] The disputed property is located between Bayou Boulevard, a street that runs along the western perimeter of the development, and the waters of Bayou Texar. In 1909, the East Pensacola City Company conveyed the lots in Block 59, which are located across the street from the disputed strip, in deeds which referenced a plat of the subdivision made by J.E. Kauser in 1893. The Kauser map shows the development subdivided into lots and blocks and also shows an unnamed strip of land running along the western boundary of the subdivision between the platted lots and the shoreline of Bayou Texar. At the turn of the century there was apparently a wagon trail along this strip which became more extensively used over time until it was finally paved by the county and officially designated as Bayou Boulevard.[2]
Appellants Daniel and Mary Bowen purchased lots in the southwest portion of Block 59 in the early 1940's, at which time *1092 the shoreline of Bayou Texar ran alongside the dirt road now known as Bayou Boulevard. According to the Bowens, the land now in dispute was at that time covered with water. By 1946 it had become a boggy area, covered with thick brush and potholes of standing water. At some time in the early 1950's, a road contractor working in the area received permission from the Bowens to dump sand onto the disputed property. The Bowens thereafter planted grass, trees and a garden, and have maintained and used the property up to the present time. In 1957 the Bowens gave the City of Pensacola an easement across the disputed property for installation of a sanitary sewer line.
As early as 1941, the county installed culverts under Bayou Boulevard to carry storm water runoff. These storm sewers, and the areas surrounding them, were maintained by the City after the subdivision was annexed in 1953. According to the Bowens, much of the accretion which has occurred since 1953 has been caused by sand washed onto the disputed area by the storm drains from Stanley Avenue and Lee Street.
In 1976 Charles and Ellen Lea and Julia Tait purchased the lots in the northwest section of Block 59 by warranty deed which contained a legal description of the lots and included the following language:
... together with the Grantors' right, title and interest, including riparian rights, in and to all or any part of the land and water bounded by a westerly extension of the South line of Lot 9, Block 59, running to the waters of Bayou Texar, and a northerly extension of the East line of Lots 9, 10, 11 and 12, Block 59, running to the waters of Bayou Texar.
On May 26, 1977, the Leas and Tait obtained a quit-claim deed from their neighbors to the north for an area of waterfront property which included not only the land directly across the street from the lots owned by the Leas and Tait, but also for part of the property directly across the street from the Bowens' lots. This latter portion of the waterfront property is the land in dispute.
On July 28, 1977, the Bowens filed a petition for injunction to restrain the Leas from erecting a fence along the northern border of the waterfront property claimed by the Leas; this case was dismissed without prejudice. In the spring of 1978, the Bowens obtained a survey of the waterfront property directly across from their lots and a building permit to erect a fence along the northern border of this property. When Mr. Lea tore down the fence erected by the Bowens, Mrs. Bowen had him arrested.[3] Thereafter, the Bowens obtained a quit-claim deed from Agnes Leaman, their neighbor to the south, for the waterfront property directly across from their lots.
On March 30, 1981, appellees Dickson and Williams purchased the waterfront property claimed by the Leas. On July 28, 1981, Dickson and Williams filed suit to quiet title to the disputed parcel, claiming record title based on a chain of title from October 18, 1963, coupled with a claim of title by adverse possession; a second count sought damages for slander of title. The City of Pensacola was allowed to intervene, claiming the sanitary sewer easement from 1957 and claiming also that portions of the subject property are dedicated public street rights-of-way. Barry Bonifay, a subdivision lot owner whose deeds referenced the Kauser map, was also allowed to intervene, claiming an implied private easement of access across the disputed property.
At trial, Williams testified that the property appeared well kept at the time of the 1981 purchase, that he paid property taxes for 1981 and 1982, and that he hired a lawn care agent to maintain the property from March, 1981 to the present, but that he does not know who maintained it prior to his purchase. The Bowens defended the action, testifying to their use and possession of the property for forty years, but did not seek by counterclaim to quiet title in *1093 themselves. In his final judgment, the trial judge found, inter alia, that the accreted property in dispute is adjacent to property delineated on the Kauser map; that the intent of the original owners of the undesignated strip of land west of the blocks and lots may not be deduced from the plat as a roadway; that the City has permitted buildings to be constructed on portions of the undesignated part of the property; and that the proof of acceptance of a public dedication was insufficient.[4]
In order to determine the interests of each of the parties in the disputed property, it is necessary to examine its history, starting with the map drawn by J.E. Kauser in 1893. The first issue to be determined is whether this map, with respect to which the lots in the development were conveyed by the East Pensacola City Company, constitutes an offer of dedication to public use of the platted roadways. Common law dedication, one of several processes by which an owner of an interest in land can transfer to the public either ownership or a privilege of user for a public purpose, requires an intention to dedicate the property to the use of the public, acceptance *1094 by the public, and clear and unequivocal proof of these facts.[5]
An intention to dedicate may be implied from the acts of the landowner, including filing a map or plat of the property designating the roadways thereon, or platting the land and selling lots pursuant to the plat, indicating thereon places for parks, public grounds, and streets. City of Palmetto v. Katsch, 98 So. 352 (Fla. 1923). Although it appears that the Kauser map was recorded subsequent to the conveyance of the subject lots in 1909, an offer of dedication may be implied from the fact that these conveyances were made with reference to the Kauser map.
The next question is whether the dedicator intended to dedicate the unnamed strip of land in dispute, as well as the named streets designated on the map. Construing the plat as a whole and resolving any ambiguity regarding the extent of the dedication against the dedicator and in favor of the public, Florida East Coast Ry. Co. v. Worley, 38 So. 618 (Fla. 1905), we construe the map as evidencing the owner's intention to dedicate the disputed strip, as well as the named streets.
It must also be determined whether the owner intended to dedicate for public use the entire strip, or only so much of it as was required for a public road, leaving an irregular strip of undedicated land on the water side of the road. In Brickell v. Town of Ft. Lauderdale, 78 So. 681, 683 (Fla. 1918), the court observed:[6]
A single undulating line is usually used for marking a water boundary not affected by tides, while several parallel waved lines are used to mark a water boundary where tides ebb and flow; and where these are found on a plat they should be taken to define a lot or street lying on the water, with nothing between it and the water, in the absence of anything appearing to the contrary on the plat or in the dedication.
We construe the map as indicating an intention to dedicate the entire width of the undesignated strip, from the lot lines to the water's edge, for public purposes.[7]
Acceptance of an offer of dedication may be expressed or may be implied from acts showing an intention to accept, including, among other things, use by the public or maintenance and improvement by the proper authorities of part of the land dedicated.[8] In City of Pensacola v. Walker, 167 So.2d 634 (Fla. 1st DCA 1964), this court noted that a wagon trail existed along the disputed strip in the early 1900's and that as it became more extensively used, it was graded and paved by the county and officially dedicated as Bayou Boulevard. The record reflects that in the early 1940's the county installed culverts under Bayou Boulevard to carry storm water runoff, and that these culverts were maintained by the City after the subdivision was annexed in 1953. These acts of the public authorities in maintaining and improving the road and the storm sewer lines may be construed as indicating acceptance of the entire strip offered for dedication.[9]
*1095 The Florida Supreme Court held in Indian Rocks Beach South Shore, Inc. v. Ewell, 59 So.2d 647 (Fla. 1952), that public acceptance by use of the main thoroughfare of a platted subdivision constituted an acceptance of the offer to dedicate the entire system of streets appearing on the plat. A similar result was reached in Waterman v. Smith, 94 So.2d 186 (Fla. 1957), in which it was held that an offer to dedicate two contiguous alleys was wholly accepted by the City's action in paving one of them. In Smith v. City of Melbourne, 211 So.2d 66 (Fla. 4th DCA 1968), the court held there was a completed dedication of a 30-foot road right-of-way although the City had not paved the full width of the roadway. And in Dade County v. Harris, 90 So.2d 316 (Fla. 1956), use of a portion of a highway right-of-way as a "grass parkway" was held not incompatible with dedication and user of the whole for highway purposes. Section 95.361, Florida Statutes (1977), which establishes a presumption of dedication when a road has been maintained by public authorities for four continuous years, but only to the extent in width that has actually been maintained for the prescribed period, does not limit the operation of common law dedication as discussed in the cited cases.
City of Pensacola v. Walker, supra, in which this court affirmed the chancellor's finding that the evidence affirmatively established a lack of acceptance by the public of an offer to dedicate the disputed strip of land to public use, except as to the right-of-way of Bayou Boulevard, is distinguished from the instant case on its facts and should not in our opinion be extended to control the determination of ownership and other property rights with respect to land not involved in that litigation.[10]
Although section 95.361, Florida Statutes provides for acquisition of fee title to the "dedicated" road, Madden v. Florala Telephone Company, 362 So.2d 475 (Fla. 1st DCA), appeal dismissed, 367 So.2d 1125 (Fla. 1978), common law dedication leaves ownership of the land in the dedicator, giving to the public rights of easement only.[11] Under the doctrine of estoppel in pais, the dedicator is precluded from exercising any right in the dedicated property which conflicts with the rights of the public.[12] On acceptance of the dedication by the public, the public rights of easement take precedence over any title to the street acquired by purchasers of abutting lots.[13]
The general rule is that the abutting lot owners own fee title to the middle of a dedicated street, Burns v. McDaniel, 140 So. 314 (Fla. 1932). However, where the dedicated street runs along a navigable body of water, the abutting lot owners own the fee title to the entire width of the dedicated land, as well as title to the accretions formed along the street. See Burkart v. City of Fort Lauderdale, 168 So.2d 65 (Fla. 1964), in which a recorded subdivision plat dedicated a street along a navigable body of water to the public, but provided that the riparian rights were reserved to the subdivider and its successors. The court held that the subdivider's successors held the fee interest in the accretions which formed along the street, but that the accretions were subject to the street easement, *1096 so that the general public had the right to use the accretions for access to the water.
A careful examination of the Burkart opinion, and application of the principles enunciated therein to the facts of the instant case, leads to the conclusion that the Bowens hold fee title to the disputed property, since it lies directly across the street from their lots. However, this fee title is subject to the public easement, including the riparian rights incident to that easement. We make this statement by way of observation only, since the Bowens have not requested the trial court to quiet their title to the disputed property, nor has the City claimed a public easement encompassing the entire parcel. The foregoing and following analyses of the competing interests of the parties in the subject property are intended as a guide for future determinations regarding ownership of and easement interests in this and other similarly situated property.
In addition to public rights which may be created by dedication and acceptance, conveyances in reference to a plat may also create private rights in the purchasers of subdivision lots to have the public places described in the plat maintained for their designated uses.[14] In McCorquodale v. Keyton, 63 So.2d 906, 910 (Fla. 1953), the court stated the rule that when lots are sold with reference to a recorded subdivision plat, the purchasers acquire by implied covenant a private easement in lands of the grantors other than those specifically deeded, the purpose of the rule being "not to create public rights, but to secure to persons purchasing lots under such circumstances those benefits, the promise of which, it is reasonable to infer, has induced them to buy portions of a tract laid out in the plan indicated." Appellant Bonifay asserts such a private easement across the disputed property. A similar claim was asserted in Bonifay v. Garner, 445 So.2d 597, 603 (Fla. 1st DCA 1984), in which this court found that the evidence presented "would support a finding that appellant, and others similarly situated, have an implied easement of access to the waterfront property west of Bayou Boulevard, unless these private easements have been extinguished by adverse possession, abandonment, nonuser, estoppel, or some other basis." Bonifay's deed and the referenced Kauser map support his claim of an implied easement across the property in dispute in this case, absent a finding that the easement has been extinguished.
This leaves for determination the rights of appellees Dickson and Williams, plaintiffs in the quiet title action. Appellees' claimed title to the disputed property appears to be based upon two theories: record title based upon a chain of title beginning with a conveyance in 1963, and title by adverse possession under color of title. We will treat the claim based upon chain of title first. Our earlier analysis leads to the conclusion that the Leas and Tait held fee simple title to the waterfront property directly in front of their lots, which title they conveyed to Dickson and Williams in 1981, subject to the public and private easements thereon. However, the language in appellees' chain of title[15] does not give them any title to the disputed property, which lies directly in front of the Bowens' lots. Although found in "warranty deeds", this language, with respect to the disputed property, is in the nature of a "quit-claim" deed, conveying only that interest which the grantor holds in the described property. Appellees' claim to the disputed property based upon their chain of title therefore fails.
The final issue is whether appellees have shown valid title by adverse possession under color of title. Although adverse possession cannot operate to divest the public or governmental unit of rights in *1097 a dedicated plat, Laube v. City of Stuart, 107 So.2d 757 (Fla. 2d DCA 1958), fee title may be acquired and private rights of easement extinguished by adverse possession, Bonifay v. Garner, supra. In order to acquire rights by adverse possession, appellees were required to prove seven years of continuous, exclusive, open and notorious, adverse possession under "color of title". Section 95.16, Florida Statutes (1977).
Seven years prior to the initiation of this quiet title action the lots in the northwest section of Block 59 were owned by one Kirkpatrick, whose deed contained language similar to that already quoted. This raises the question of whether a quit-claim deed may be used to establish color of title where the grantor had no interest in the property allegedly conveyed. This question was answered in the affirmative in Deverick v. Bailey, 174 So.2d 440 (Fla. 2d DCA 1965), in which the court reversed a summary judgment, finding that the allegations and affidavits as to adverse possession were sufficient to create a genuine issue of material fact. However, in a later appeal, Deverick v. Bailey, 224 So.2d 361 (Fla. 2d DCA 1969), the court affirmed the lower court's finding that appellant had not proven title by adverse possession, where her color of title was based upon a warranty deed from her daughter, pursuant to a quit-claim deed from Shannahan, in which Shannahan's only basis of title was a sales agreement or option to purchase which was more than twenty-five years old and which the court found had long since become void. Since the doctrine of color of title is available only in cases where the instrument purporting to be a conveyance is accepted in good faith and in the honest belief that it vests title in the claimant, Simpson v. Lindgren, 133 So.2d 439 (Fla. 3d DCA 1961), the question of whether a quit-claim deed establishes color of title depends upon the circumstances under which it is given and received. Although the original 1963 deed upon which appellees' chain of title is based may not have constituted good faith color of title, the ensuing series of deeds could be found to constitute color of title, as long as the grantees did not know that their grantors had no interest in the disputed property.
Although appellees may have shown color of title, the record does not support a finding that they and their predecessors in interest have been in continuous, exclusive, open and notorious, adverse possession of the disputed property for at least seven years prior to the filing of the quiet title action. Appellees testified that they have paid taxes for 1981 and 1982, and have engaged a yard maintenance service to maintain the property since their purchase. However, their possession dates from March 30, 1981. Appellees have presented no evidence regarding any acts of possession by their predecessors in interest prior to 1976, and insufficient acts by the Leas to constitute "adverse possession". On the contrary, the Bowens testified that they have continuously maintained the property since the 1940's.
Because appellees, plaintiffs in the quiet title action, have failed to establish valid title to the disputed property, we must reverse the judgment of the trial court. We recognize that our decision regarding the parties' interests in this section of the waterfront property bordering Bayou Texar will have implications for future determinations of property rights to other sections of the strip, including the trial court's further consideration of the issues in Bonifay v. Garner, supra.[16] We do not resolve the issues raised by our observations and analyses, as they pertain to possible claims by appellants and others to property rights in the disputed parcel. Our decision is *1098 limited to the finding that Dickson and Williams did not carry their burden of showing valid title to the subject property. The judgment is REVERSED and the cause is REMANDED to the trial court for issuance of an order that the plaintiffs take nothing by the quiet title action.
JOANOS and WIGGINTON, JJ., concur.
NOTES
[1] See Bonifay v. Garner, 445 So.2d 597 (Fla. 1st DCA 1984) and cases cited therein.
[2] See City of Pensacola v. Walker, 167 So.2d 634, 635 (Fla. 1st DCA 1964).
[3] Lea later won a $10,000 judgment against Mrs. Bowen for malicious prosecution.
[4] The Court's specific findings are as follows:

1) This cause was heard by the Court in an action filed by the Plaintiffs to quiet title to property created through accretion, which accreted property is adjacent to property delineated on a revised map of East Pensacola from a resurvey made in 1893 by J.E. Kauser, C.E.
2) That the map or plat contained no dimension thereon as to the width of the lots or streets. The blocks and lots do not extend on the map to the water body. Depicted on the map is a meander line of the water body in the front of said blocks, which line is not designated on said map as a roadway or by any other designation. The map or plat was not recorded until 1915.
3) That the evidence adduced at Final Hearing revealed that several homes and structures had been erected on the undesignated portion of property adjacent to the water body in the near proximity of the subject property impeding vehicle travel of that portion of the roadway.
4) That evidence additionally indicates that the original owners of the entire tract did not convey any of the property which is the subject of this suit. It is apparent from the testimony that the original owners did not exercise dominion over said property in question nor did they pay taxes on same.
5) That the map or plat pertaining to the subject property was a resurvey of the property by J.E. Kauser, C.E., made in 1893, which survey was not recorded until August 30, 1915. The subject property, lying and being to the West of Block 59, is an undesignated strip of property meandering along the Bayou. That the intent of the original owners of the property may not be deduced from the plat as a roadway inasmuch as there is no designation as such or even any distances reflected on the plat from the property line to the body of water.
6) That the City has permitted buildings or structures to be constructed on a portion of the undesignated part of the property which lies adjacent to the waterbody impeding any vehicular traffic on said undesignated strip. As was determined in City of Pensacola v. Walker, 167 So.2d 634, "The proof of acceptance by the public of an offer of dedication must be `clear, satisfactory and unequivocal'." The proof of acceptance by the public falls far short of the standard set by the rule in Mumaw, therefore, it is hereby:
ORDERED AND ADJUDGED:
1. That this Court has jurisdiction over the subject matter hereof and the parties hereto, and that the equities of this cause are with the Plaintiffs.
2. That the title of the Plaintiffs, BARRY E. DICKSON and JOHN R. WILLIAMS, in and to the following-described lands in Escambia County, Florida, to wit:
That portion of land lying West of and adjacent to Block 59 and to the waters of Bayou Texar, according to map of East Pensacola Heights, by J.E. Kauser, dated 1893, and recorded in Deed Book 77, at Page 520, of the public records of Escambia County, Florida, described as follows: Beginning at the Northwest corner of Lot 9 of said Block 59; thence run North 41° 00'40" West for 156 feet more or less to the waters of said Bayou, hereinafter referred to as Point "B"; thence beginning again at the Point of Beginning run South 49° 39'20" West along the Northwest line of said Block for 38.87 feet; thence run North 90° 00' West for 81.30 feet; thence run North 49° 00'40" West for 106 feet more or less to the waters of said Bayou; thence meander Northeasterly along said waters to aforesaid Point "B" for the end of this description, less Bayou Blvd. right-of-way.
Together with all and singular the tenements, hereditaments and appurtenances thereunto belonging or in anywise appertaining, be and the same is hereby, confirmed in and to the Plaintiffs, BARRY E. DICKSON and JOHN R. WILLIAMS, as a good and valid fee simple title, free and clear of any and all rights, titles or claims of the Defendants named herein, and the said Defendants named herein, be and they are hereby, forever barred and foreclosed of all rights, titles, interests and claims in and to said land.
[5] However, there are no specific formalities necessary to constitute an effective common law dedication. 2 R. Boyer, Florida Real Estate Transactions § 30.02 (1984).
[6] See also Earle v. McCarty, 70 So.2d 314 (Fla. 1954); Burkart v. City of Fort Lauderdale, 168 So.2d 65 (Fla. 1964), and Feig v. Graves, 100 So.2d 192 (Fla. 2d DCA 1958).
[7] Attached to the motion for rehearing filed by the City and Bonifay was a copy of a portion of a survey of the area by Waring Chapman and Farquhar made in January, 1889, with reference to which Block 53 (not involved in this dispute) was conveyed in 1890. This survey shows a roadway along the disputed strip, indicated by two parallel lines and designated as "Lake Boulevard South." There is no indication that this survey was ever recorded or that any other lots were conveyed with reference to it. We consider the recorded 1893 Kauser map controlling in this cause.
[8] 2 R. Boyer, Florida Real Estate Transactions § 30.05 (1984).
[9] For the most part, the strip of land in dispute (the parties are not claiming an interest in the land under Bayou Boulevard) did not exist at the time of acceptance by the county, but is a product of accretion over the past forty years.
[10] The question is not before us at this time. However, we would find that although the chancellor's findings in Walker may have been justified by the unique circumstances of that case, the Walker court's reliance upon Mumaw v. Roberson, 60 So.2d 741 (Fla. 1952) was inappropriate, in that Mumaw was factually totally distinguishable from Walker.

It remains a mystery to us that the appellate court characterized one of the chancellor's findings as "the recording of the plat might be held to be an implied offer to dedicate the disputed strip of land to public use" and did not determine the question of whether there was intention to dedicate. Since the court apparently held that there was an acceptance of a part of the offer to the extent of the right-of-way of the public street, it is only logical that acceptance followed an offer. To think that there could be an acceptance in the absence of an offer is illogical.
[11] 2 R. Boyer, Florida Real Estate Transactions § 30.07 (1984).
[12] Id.
[13] Id.
[14] Id. § 30.05.
[15] Except for the 1981 deed conveying the waterfront property to appellees, which describes the property by metes and bounds, the deeds in appellees' chain of title, starting with the 1963 conveyance, use language similar to that used in the 1976 conveyance to the Leas and Tait, quoted in the text.
[16] Bonifay v. Garner, 445 So.2d 597 (Fla. 1st DCA 1984), involved a claim of title based on deeds to appellee and his predecessors in interest conveying "any right that (grantors) may have to the riparian rights belonging to any of the foregoing lots or blocks". The claim of title was also based upon adverse possession, where "color of title", not possession, was the issue. The trial court's holding that there had been no public dedication of the undesignated strip was not challenged on appeal.