226 So.2d 123 (1969)
Elizabeth Purnell WILSON et al., Appellants,
v.
James B. KELLEY et al., Appellees.
No. 68-421.
District Court of Appeal of Florida. Second District.
May 14, 1969.
Rehearing Denied September 17, 1969.
*124 W.L. Stewart, of Stewart & Stewart, Fort Myers, for appellants.
Julian D. Clarkson, of Henderson, Franklin, Starnes & Holt, Fort Myers, for appellees.
LILES, Chief Judge.
Appellants, plaintiffs in the trial court, brought suit to quiet title against defendants, appellees here. We will refer to the parties as they appeared in the trial. Defendants moved to transfer the cause to the law side asking for a trial by jury pursuant to what is now Fla. Stat. § 65.061 (1967), F.S.A. The jury returned a verdict in favor of plaintiffs, after which defendants filed a motion for judgment n.o.v. and a motion for a new trial. The motion for a new trial was denied but the motion for judgment n.o.v. was granted, and a final judgment was entered in favor of defendants. This appeal followed.
The facts as alleged in plaintiffs' complaint were that Elizabeth Wilson, plaintiffs' predecessor in title, acquired a patent from the United States Government covering all of a government lot abutting the Gulf of Mexico on Sanibel Island. In 1892, she conveyed to William P. Pearde, Sr., and J.T. Pearde, defendants' predecessors in title, by a metes-and-bounds description, a parcel which constituted almost all of the east half of the lot. Elizabeth Wilson apparently never disposed of the small remaining part, and this is the land now in dispute. The record does not reveal whether the parties to the 1892 deed may have believed that it covered the entire east half of the lot or whether Elizabeth Wilson intended to retain a part. In any event, beginning in 1906 the entire east half of the lot (less a portion not relevant here) was assessed for taxation to the Pearde family.
William P. Pearde, Sr., died during or prior to 1912, presumably intestate, leaving as his only heirs his daughter, Penelope, and his son, J.T. Pearde, who had been the co-grantee in the 1892 deed. By deed dated and recorded in 1912, Penelope and her husband conveyed to J.T. Pearde "* * * all the right, title, interest, claim and demand which [the grantors] have in and to * * *: An undivided one-half interest" in the same land that since 1906 had been assessed for taxation to the Pearde family. *125 In other words, the 1912 deed expanded the description in the previous deed and purported to convey not only land in which the grantor held an interest, but it purported to convey an interest in an undivided one-half interest in the land now in dispute in which the grantor was not shown to have held a record interest.
During or prior to 1916, the grantee, J.T. Pearde, died intestate, leaving as his only heirs his wife, Beulah, and his daughter, Wilhelmina. In 1916, Beulah died, devising all of her property to Wilhelmina but without a specific devise of the land now in dispute. In 1925, a guardian was appointed for Wilhelmina, who was still a minor. In the same year her guardian obtained a court order authorizing him to take possession of his ward's real estate, which was proper procedure under the guardianship laws as they existed at that time. The guardian's petition used the same land description as used in the 1912 deed and on the tax rolls. The court order did not contain a land description but incorporated by reference the one in the petition. By warranty deed dated and recorded in 1943, Wilhelmina conveyed, or purported to convey, the same land to defendants or their immediate predecessors. Until the recording of the 1943 deed, the only recorded title instrument or court proceeding making particular reference to the land now in dispute, subsequent to the patent from the United States, was the 1912 quitclaim deed to Wilhelmina's father and the 1925 guardian's petition, both mentioned above.
Plaintiffs claim as heirs of the patentee, Elizabeth Wilson, and their chain of title consists only of their ancestor's patent and their proof of heirship. From 1906, as indicated above, continuously to the commencement of this litigation the land now in dispute has been included in descriptions of land assessed on the tax rolls to defendants or their predecessors, during which the land has never been assessed to plaintiffs or their predecessors. Since 1958 this land has been assessed by a specific metes-and-bounds description. Plaintiffs have never improved, occupied, or used the land. It is fair to say from the evidence that until defendants began efforts to clear the title in 1964, plaintiffs did not realize that they might have a claim to the land. The land is essentially in its native state and was not occupied nor improved until defendants enclosed it with a fence in 1964, two years before the present suit was commenced, and defendants, as well as plaintiffs, cannot establish title by adverse possession.
Plaintiffs contend that their title is the original and paramount title, and that it has not been divested. Defendants contend that plaintiffs are barred by both the Florida Marketable Record Title Act[1] and by laches.
The trial judge in his order denying a new trial and granting a judgment n.o.v. said:
"The court having duly considered said motions and having granted Defendants' Motion for Judgment N.O.V. in that Defendants have good and marketable title to the property described herein by virtue of the Florida Marketable Record Title Act, Florida Statutes 712 [F.S.A.]"
The court then declared defendants to be the fee simple owners of the land in question.
Defendants had based their motion for a new trial on the grounds that the verdict of the jury was contrary to the evidence supporting the defense of laches. In defendants' cross-assignments of error, they urge this court to affirm the decision of the trial judge even if it is held that the Marketable Record Title Act does not apply because the undisputed facts entitle the defendants to a judgment n.o.v. based on laches. Plaintiffs urge that the trial court erred in setting aside the jury verdict.
Plaintiffs contend that the defendants have no standing to invoke the Act because *126 defendants cannot chain their title back to a recorded instrument or court proceeding that has been of record at least thirty years and that purports to create or transfer the fee simple estate claimed by defendants. Defendants on the other hand argue that the 1912 quitclaim deed discussed above constitutes a good "root of title" within the contemplation of the Act.[2] Plaintiffs urge that the quitclaim deed will not qualify under the Act for the reasons that it is apparently an "interloping" or "wild" deed and that it is a quitclaim deed; plaintiffs also urge that the 1925 guardianship order cannot serve as a root of title because it did not purport to create or transfer any land but only authorized the guardian to take possession of the ward's land.
The trial judge in his judgment n.o.v. relied upon both the 1912 quitclaim deed and the 1925 court order as establishing a root of title which thereby gave the defendants the entire interest in the land in dispute rather than an undivided one-half interest. On appeal, defendants have elected to rely upon the 1912 quitclaim deed as their root of title and not upon the 1925 court order.
There has been growing recognition that a worthy and important public purpose is the simplification of the land title examination and enchancement of the marketability of land titles. Ever-lengthening chains of title have threatened to make the system of determining land ownership break down from its own weight, with increasing delay, expensive quiet title suits and, more importantly, the uncertainty of marketability. An increasing number of states have enacted marketable title statutes within the past fifty years, and their constitutionality has been upheld.[3] Florida was no pioneer when it enacted one in 1963 and took advantage of the experience of other states, and the commentary of legal scholars and practitioners who have studied the subject at length.[4] Florida's act declares that it shall be liberally construed to effect the legislative purpose of simplifying and facilitating land title transactions by allowing persons to rely upon the record title as described in the Act.[5]
Plaintiffs erroneously contend that an instrument cannot qualify as a root of title within the contemplation of the Florida Marketable Record Title Act unless it *127 constitutes part of the chain of title emanating from the sovereign. To hold as suggested by plaintiffs would frustrate the Act's intended beneficial effects, and the Act's utility would largely be confined to the elimination of ancient use restrictions and to the curing of formal irregularities, a function already performed by other statutes and usually more quickly than the marketable title act.
The Act, as a marketable title act, is not concerned with the quality of the title conveyed by the root of title so long as the root purports to convey the estate claimed. This can be so even though a deed is not part of the chain of title emanating from the sovereign and is therefore often called an "interloping" or "wild" deed. It can, under the marketable title acts, form a root of title which may eventually cut off the interest of a person who might otherwise have a claim. Therefore, a marketable title act can cure a break in the chain of title, if the break is sufficiently old.
The Act obviously intended to make it unnecessary for a person relying upon it to search back to the sovereign, other than to determine that title had passed from the sovereign; to determine what rights the sovereign may have reserved; to determine the existence and significance of pre-root matters that are apparent from or indicated by his root of title and any subsequent muniments of his title; and to resolve any apparent estates or interests arising out of title transactions recorded subsequent to the root of title. The searchers should also investigate pre-root matters that may support the claims of any persons in possession or in whose name the land has been assessed on the tax roll for the past four years, and that may support existing usage of easements, rights-of-ways, or terminal facilities.[6]
For those who are concerned with the likelihood that the Act will allow an interloping deed to cut off another person's deserving interest in favor of an undeserving person, there are safeguards in the Act to prevent this from happening. A claimant will not be cut off if he has been a party to any title transaction recorded within a period of not less than thirty years or if he files a simple notice prescribed by the Act during the time allowed for this purpose. He will not be cut off if he remains in possession or if the land is assessed to him on the tax roll. Even if it is no longer assessed to him he is protected if it was assessed to him at any time during the preceding three years. But if he has been a party to no title transaction recorded for at least thirty years during which time he has also failed to file the notice, and if for more than three years he has allowed the land to be assessed for taxation to someone else, and if neither he nor any person claiming under him is in possession of the land, it would not seem unjust that his claim should be subordinate to another person's claim that is based upon a chain of title going back to an instrument or court proceeding that has been recorded at least thirty years, and that "purports to create or transfer the estate" claimed by the second person. In the public interest of simplifying and facilitating land title transactions, it does not seem unreasonable for the legislature to create a presumption that one who is negligent in claiming his land has abandoned his claim.
Having determined that a wild chain of title can constitute a marketable record title within the terms of the Act, it must now be determined whether defendants have a wild chain of title that complies with the provisions of the Act.
In the instant case defendants have attempted to invoke the Act by chaining their title back to a 1912 quitclaim deed. They assert this as their root of title. A root of title is "any title transfer purporting to create or transfer the estate claimed *128 * * *."[7] Clearly a quitclaim deed is a title transaction, but it appears that it is not possible to determine what estate it purports to transfer.
A quitclaim deed only purports to transfer whatever interest the grantor may have had in the land. An ordinary quitclaim deed, or a quitclaim deed in the pure form, does not on its face specify the exact interest the grantor was attempting to convey. He may have been conveying a fee simple interest, or something less than a fee simple interest, and it is impossible to determine from the face of the instrument what interest or estate in land it "purports to convey." This is the view that has been adopted by the Supreme Court of Nebraska.[8]
For example, if the deed merely provides that the grantors "remise, release and quitclaim all the right, title, interest, claim and demand which the grantors have in and to Blackacre," it cannot serve as a root of title because it is unknown what "right, title, interest, claim and demand" the grantors may have had in Blackacre.
On the other hand, a quitclaim deed can serve as a root of title if it evidences an intent to convey an identifiable interest in the land. If the deed itself specifically states what interest the grantors intend to convey it can constitute a root of title because in this instance the instrument itself purports to convey an interest in land. Thus the mere absence of warranty covenants is not fatal and the instrument can serve as a root of title.[9]
For example, if the quitclaim deed provides that the grantors "remise, release and quitclaim our undivided one-half interest in and to Blackacre," or "remise, release and quitclaim all the right, title, interest, which consists of an undivided one-half interest, in and to Blackacre," it can serve as a root of title because it is known from the face of the instrument precisely what interest it purports to convey.
In the present case the 1912 quitclaim deed falls within the former category. It provides that the grantors "remise, release, and quitclaim * * * all the right, title, interest, claim and demand which [the grantors] have in and to the following * * *: An undivided one-half interest in [land including that which is involved in the present case]." From the face of the deed it is impossible to determine what interest the grantors held in the undivided one-half interest, and it is therefore unknown what interest the deed purports to convey.[10] The fact Penelope and her husband did not specify what interest they were transferring is fatal to defendants' case.
Since the quitclaim deed relied upon by defendants as their root of title cannot constitute a root of title, defendants do not have a marketable record title to the land involved in this suit.
In answer to defendants' cross-assignment of error regarding laches, it appears from the record that this issue was submitted to the jury with clear and explicit instructions on laches. The jury decided *129 the issue, as in fact they should have, and we cannot now set that jury's verdict aside. The elements which constitute laches have not from the record been proven.
For the reasons herein set forth the final judgment of the trial court is reversed with instructions for the entry of final judgment in favor of plaintiffs based upon their being the heirs of the original patentee and it appearing that nothing has occurred which would divest them of ownership.
In view of our holding it is respectfully submitted that the trial judge may feel disposed to take jurisdiction for the purpose of taking testimony to determine whether or not plaintiffs owe defendants any reimbursement for taxes they may have paid on the land involved in this suit.
Reversed and remanded.
HOBSON and MANN, JJ., concur.
NOTES
[1] Chapter 712, Florida Statutes (1967), F.S.A.
[2] The Act defines a "root of title" as "any title transaction purporting to create or transfer the estate claimed by any person and which is the last title transaction to have been recorded at least thirty years prior to the time when marketability is being determined. The effective date of the root of title is the date on which it was recorded." Fla. Stat. § 712.01(2) (1967), F.S.A. A "title transaction" is "any recorded instrument or court proceeding which affects title to any estate or interest in land." Fla. Stat. § 712.01(3) (1967), F.S.A.
[3] See, e.g., Wichelman v. Messner, 1957, 250 Minn. 88, 83 N.W.2d 800, 71 A.L.R. 2d 816.
[4] For discussions of the need for and purpose of marketable title acts, and their application and constitutionality, see 1 BOYER, FLORIDA REAL ESTATE TRANSACTIONS § 14.14 (1968); THE FLORIDA BAR, FLORIDA REAL PROPERTY PRACTICE I, §§ 6.1-6.6 (1965); SIMES & TAYLOR, THE IMPROVEMENT OF CONVEYANCING BY LEGISLATION, esp. at 3-16, 295-361 (1960); Aigler, Marketable Title Acts, 13 U.MIAMI L.REV. 47 (1958); Barnett, Marketable Title Acts  Panacea or Pandemonium?, 53 CORNELL L. REV. 45 (1967); Boyer and Shapo, Florida's Marketable Title Act; Prospects and Problems, 18 U.MIAMI L. REV. 103 (1963); Carmichael, The Current Proposed Marketable Title Act, 34 FLA.B.J. 1056 (1960); Catsman, Function of a Marketable Title Act, 34 FLA.B.J. 139 (1960); Catsman, A Proposed Marketable Record Title Act for Florida, 13 U.FLA.L.REV. 334 (1960).
[5] "This law shall be liberally construed to effect the legislative purpose of simplifying and facilitating land title transactions by allowing persons to rely on a record title as described in § 712.02 subject only to such limitations as appear in § 712.03." Fla. Stat. § 712.10 (1967), F.S.A.
[6] These observations as to matters that must be investigated are based upon the exceptions to marketability set out in Section 712.03 of the Act.
[7] Fla. Stat. § 712.01(2) (1967), F.S.A.
[8] Smith v. Berberich, 1959, 168 Neb. 142, 95 N.W.2d 325.
[9] See 1 BOYER, FLORIDA REAL ESTATE TRANSACTIONS § 14.14-8 (1968); Barnett, Marketable Title Acts  Panacea or Pandemonium? 53 CORNELL L.REV. 45, 58 n. 40 (1967).
[10] The reason for this rule is evident from the facts of this very case. Here Penelope and her husband were attempting to convey an undivided one-half interest in the undivided one-half interest which she and J.T. Pearde acquired when William P. Pearde died intestate. J.T. Pearde already owned the other undivided one-half interest since he was co-grantee in the 1892 deed. Therefore, Penelope and her husband thought they were conveying an undivided one-fourth interest in the land described in the deed which erroneously included the land involved in the present case. From the face of this deed there is no way to know that this was the only interest involved.