# STATE OF FLORIDA DEPARTMENT OF TRANSPORTATION, et al v AMERADA HESS CORPORATION v AMERICAN ROYALTY PRODUCING COMPANY, etc.

## Case No. 86-C-652

First Judicial Circuit, Santa Rosa County

March 4, 1991

## APPEARANCES OF COUNSEL

**Eric J. Taylor,** Assistant Attorney General, Office of the Attorney General, **Thornton Williams,** General Counsel, Florida Department of Transportation, **Joseph R. Boyd, Esquire,** Boyd & Branch, for plaintiff, Florida Department of Transportation.

**Thomas V. Dannheisser,** County Attorney, Santa Rosa County, for plaintiff, Santa Rosa County.

**Michael J. Pugh, Esquire,** Smith, Sauer, DeMaria, Pugh & Johnson

and **David Castro, Esquire,** Corporate Counsel, for defendant, Amerada Hess Corporation.

**Hume F. Coleman, Esquire,** Holland & Knight and **Dennis K. Larry, Esquire,** Partington, Clark, for third party defendant, Exxon Corporation.

## OPINION OF THE COURT

NANCY GILLIAM, Circuit Judge.

### *OPINION*

The undersigned judge has considered the evidence and argument of counsel in the above captioned matter and rules as follows.

### I. INTRODUCTION

The reformation and quiet title portions of this litigation came on for final hearing, without a jury, September 17, 18, 19 and 20, 1990, and January 7, 8, 9 and 10, 1991. In addition to the evidence and legal argument presented at the bifurcated hearing, the court has considered the oral and written argument of counsel submitted for the December 4, 1989, hearing on the motions for summary judgment, and has spent an additional five days in reviewing the exhibits and evidence, testimony, and legal argument of counsel.

In reaching this opinion which supports a partial final judgment to be later entered, the court has considered the following:

a) the pleadings;

b) testimony from the following Plaintiffs' witnesses: Ronald Carnley, Rollin Davis, Walter Robilard, and Roland Waller;

c) testimony from the following Defendants' witnesses: Ben Henry Pooley, William E. Burns (by deposition), Mrs. Jesse McCurdy (by deposition), George Autrey Thomas, Jeroel Bray, James S. Shiver, Jesse Lee Golden, Neva Gomillion, Luquetta Whitfield, Fred Thompson, Jerry Aron, Joshua Morse, Laura Higdon (by deposition), Clyde Simmons (by deposition), and Joe Cresse (by deposition);

d) Plaintiffs' exhibits, Defendants' exhibits, and joint exhibits;

e) the Stipulation of Facts along with supplemental stipulation;

f) a view of the property in question;

g) legal argument of all counsel, written and oral, relating to the motions for summary judgment and prepared for trial;

h) as well as the statutory and case law.

Due to the volume of material submitted for the summary judgment motions, the court reserved ruling on those motions. By proceeding to a final hearing on the quiet title and reformation issues, the motions for summary judgment become moot.

This law suit began as a two count complaint in accounting and conversion filed by the Florida Department of Transportation against Amerada Hess. Santa Rosa County was soon added as a party plaintiff. The granting of a motion for interpleader converted the Plaintiffs' case into a quiet title action and added reformation and quiet title counts filed on behalf of the Defendants. There are approximately 125 third party defendants, some represented by counsel, some self represented, and some against whom clerk's defaults have been entered. The third party defendants include those who assert royalty interests in the disputed land, overriding royalty interests, and working interests.

## II. FINDINGS OF FACT

Between 1948 and 1954 the State Road Department, predecessor to the Department of Transportation, acquired land along Spring Street in Jay, Florida, through the use of quitclaim deeds. This land, which is subject to conflicting claims of the parties, is located under and just abutting the road in the Mary Dobbs Moore Well area in the Jay Oil Field in a 155 acre tract, called Tract 161, located in Section 41, Township 5 North, Range 29 West, in Santa Rosa County, Florida.

The grantors of the quitclaim deeds, those who owned property along Spring Street, wanted a hard top road built in front of their properties. The grantors and Santa Rosa County sought the assistance of the State Road Department in building the road. Representatives of the State Road Department advised they would build the road if the property was obtained by the County and conveyed to the State. The earliest quitclaim deed was signed by grantor W. T. Jenkins on April 2, 1948, and the last quitclaim deed was signed on April 20, 1954, by Clyde M. and Erlene Simmons. Over the years between 1948 and 1954, various resolutions were passed by the Santa Rosa Board of County Commissioners and the State Road Department respecting their interests in constructing the road, with most of the activity occurring in 1953 and 1954.

Acting on behalf of Santa Rosa County, the local Justice of the Peace, J. L. Abbott, and Santa Rosa County Commissioner, J. F. Shell, went to each of the landowners along Spring Street to obtain quitclaim deeds. The quitclaim deeds signed by the grantors typically conveyed a five foot strip of land along side the existing right of way, although

**99**

several quitclaim deeds encompass land to the center of the road or smaller irregular strips.

At the time the quitclaim deeds were executed, there was no known discussion among any of the property owners or representatives of the governmental agencies regarding severance of mineral rights to the land conveyed to the State. The quitclaim deeds do not contain any words of limitation or reservation, reserving any mineral interests in the grantors. At that time, Spring Street was a dirt road, never having been previously paved, approximately 40 feet wide. Spring Street had previously been known by a variety of names and its predecessors were in existence prior to the Official United States Survey in 1832. From early on and continuing through the present day, the road and its predecessors have been used by the public.

On August 10, 1954, with all the rights of way having been obtained and conveyed to the State, a contract between Santa Rosa County and the State Road Department was executed leading to the construction of the road. Shortly thereafter, the contract for construction of the new road, to be titled State Road S-197, was entered into, and on June 30, 1955, work on the road was completed. That work consisted of widening, culverting, and hard topping the road.

After the Department of Transportation completed construction of the road, it was placed in the State Highway system and maintained by the Department of Transportation as a state highway until it was reclassified a county road in 1978. On September 12, 1978, all the State's right, title and interest to the right of way land was transferred to Santa Rosa County in accordance with Florida Statutes § 337.29 (1977). Upon this functional reclassification, the road was designated as Santa Rosa County Road C-197. Since 1978, Santa Rosa County and the Town of Jay have maintained the road.

At some time in the 1960's, Mr. William Moncrief, among others, began to secure mineral leases from the owners of real property in Santa Rosa County to drill for minerals under the property along the road. In 1970, Exxon drilled the first successful exploratory well in Santa Rosa County. On July 1, 1972, some of the Defendants entered into an operating agreement, which was soon amended to provide for accounting procedures for joint operations. On July 5, 1972, the Florida Department of Natural Resources approved drilling the Mary Dobbs Moore Well, and Amerada Hess started drilling this well on July 13, 1972. The well area encompasses some of the road and all of the parcels, subtracts and property subject to this litigation. The area was incorporated into a unitized field in 1974 with Amerada Hess as

100

the subunit operator. No mineral leases were ever acquired from the State of Florida or the Department of Transportation concerning the oil beneath the road or relating to the production of oil, gas and minerals from the property. The property under litigation is between approximately 2.150 and 2.180 acres of real property. Severance revenues had been placed in escrow by Amerada Hess from the start of production.

On May 8, 1982, possible title defects to the land were brought to the attention of Pat White with the Florida Department of Natural Resources via a letter from Jeffrey Sauer, attorneys with the firm now known as Smith, Sauer, DeMaria and Johnson, attorneys for Amerada Hess. A 1983 Auditor General Report was generally critical of state agencies, including the Department of Transportation, for not pursuing revenues from the exploitation of minerals under state roads. As a result of that year's audit reports, the State began the process of addressing those revenues, culminating in the filing of this law suit on February 17, 1986.

## III. ISSUES

### A.

Did the quitclaim deeds acquired by the State of Florida between 1948 and 1954 pass fee simple title to the lands described therein to the State of Florida? An integral part of the analysis of this issue is whether or not the third party defendants may succeed on their claim that those deeds must be reformed.

The meaning of a deed must be determined from its language. The entire instrument must be examined in order to determine the intent of the grantor. *Bronstein v Bronstein,* 83 So.2d 699 (Fla. 1955). The quality and quantity of the estate conveyed through a deed is controlled by the grantor's intention. *Citizens' State Bank v Jones,* 100 Fla. 1492, 131 So. 369 (1930) A court may not look beyond the four corners of a deed to determine a grantor's intention as to the quantity and quality of the conveyance unless the language or terms of the deed are ambiguous or in conflict. *Saltzman v Ahern,* 306 So.2d 537 (Fla. 1st DCA 1975). Judicial construction, including receiving parol evidence to determine the intention of the grantor, may be employed only when the language and meaning of a deed are unclear on its face. *Saltzman v Ahern, supra.*

Each of the quitclaim deeds which conveyed an interest to the State of Florida between 1948 and 1954 is in essentially the same form. The Defendants addressed the following aspects of each deed to support

their claim that the deeds are ambiguous: the notation of "SRD" in the upper right hand corner; the notation in the upper left hand corner that the document is a form; the title "Quit Claim Deed" on the document, indicating that the document on its face does not purport to convey a specific interest; that the grantee is the State of Florida for the use and benefit of the State Road Department; the stated consideration of $1.00 connected with minimum documentary stamps, indicating a lack of consideration; the language "strip of land" and "across" under the property description in some of the quitclaim deeds; the "State Road Department Division of Rights of Way description approved" stamp on the first page; the habendum clause, which states "to the only proper use, benefit, and behoof" of the State. Further, some quitclaim deeds, such as that signed by W. T. Jenkins on April 21, 1948, relating to State Road Department parcel 28, contain in the property description "less the existing right of way." The Defendants urge that the totality of these purported ambiguities in the documents themselves creates a latent ambiguity, requiring the court to take parol evidence to determine the intention of the grantors.

This court finds that there is no ambiguity within the four corners of the quitclaim deeds which conveyed land to the State between 1948 and 1954. Citing *Robb v Atlantic Coast Line Railroad Co.,* 117 So.2d 534 (Fla. 2d DCA 1960), the Florida First District Court of Appeal held that a notation on the face of the deed that "the acquisition was for road right of way purposes [did] not render the deed ambiguous on the issue of whether the estate conveyed was an easement or the fee simple title." *Holland v State,* 388 So.2d 1080, 1081 (Fla. 1st DCA 1980).

The deeds all recited consideration and were under seal, therefore signifying passage of lawful consideration. *Scoville v Scoville,* 40 So.2d 840 (Fla. 1949). It is further noted that consideration supporting many of the documents of conveyance relating to these parcels of property, including warranty deeds, which were executed both before and after the disputed quitclaim deeds, recite $1.00 consideration and show 10 cents in documentary stamps. So long as consideration is recited, the amount does not render the document ambiguous on its face. The 10 cent documentary stamp does not reflect the absence of consideration, but rather that monetary consideration was minimal.

The habendum clause is no different from that employed in other quitclaim deeds in the chains of title relating to these parcels. The only difference is that the grantee is the State of Florida for the use and benefit of the State Road Department and not an individual.

None of the disputed quitclaim deeds contain any language severing

the mineral rights. The law is clear that possession of the surface is also possession of the subsurface wherever the two estates have not been severed. *Lykes Brothers Inc v McConnel,* 115 So.2d 606 (Fla. 2d DCA 1959). The combination of right of way language in the quitclaim deeds together with the absence of severance language does not render the quit claim deeds ambiguous. Furthermore, the use of the word "across" to describe the property conveyed does not indicate an easement was intended to be transferred. "Across" means in the context of these quitclaim deeds a designation of location, similar to a metes and bounds description.

The property owners did receive valuable consideration for conveying their property to the State Road Department and that was the conversion of a dirt road, through widening, hard topping and culverting, into a road passable at all seasons and at all times.

The major focus of the Defendants' argument in support of a finding of ambiguity is that a claim deed to the State Road Department for the purposes of a right of way must mean an easement was intended. A connected argument is that a quitclaim deed on its face is ambiguous. However, the *Holland* decision stands in opposition to the first argument and the second argument is patently illogical.

Even if this court were to find an ambiguity on the face of the disputed quitclaim deeds, the parol evidence submitted by the Defendants does not support their position that an easement, rather than fee simple title, must have been granted to the State.

"Right of way" does not logically mean easement. The first statutory definition of right of way occurs in Florida Statutes § 334.03(16) (1955), where the term is defined as "[l]and in which the State, the Department, a county or municipality owns the fee or has an easement devoted to or required for use as a public road." Although this definition in the newly created Florida Highway Code did not appear until 1955, after the execution of these quitclaim deeds, it is an indication of the generally accepted meaning of "right of way." This definition continues through statutory revisions to the present day. The Florida Legislature clearly made a distinction between a "fee" or "easement devoted to or required for the use of a public road" in defining right of way.

The many resolutions passed by the Santa Rosa Board of County Commissioners and the State Road Department between 1948 and 1955 which address a right of way required for a road are relied upon by the Defendants in support of their position that the disputed quitclaim deeds granted only an easement. However, the total impact

103

of those resolutions does not support that position. A State Road Department resolution of January 19, 1948, addresses right of way *and* easements. The agreement between the County and the State Road Department dated March 9, 1948, addresses rights of way *and/or* easements. A Resolution of the Santa Rosa Board of County Commissioners of February 8, 1949, focuses on an obligation "limited to that portion of the right of way over which the R.E.A. owns its easement," indicating that right of way could contain an easement. The Santa Rosa Board of County Commissioners' Resolution of June 12, 1951, speaks of furnishing "necessary rights of way *and* easements" (emphasis supplied). A resolution of the State Road Department of February 13, 1951, recommends "right of way for the roadbed, ditches, and borrow pits . . . and lands necessary for the right of way . . . together with any and all easements" be acquired. The right of way contract for fund advancement of August 10, 1954, says "right of way, borrow pits and/or easements." Most of the governmental language focusing on this project uses the phrase "rights of way and easements," connoting a distinction between the two.

Absent fraud, mistake or accident, a written instrument cannot be reformed. *Camichos v Diana Stores, Corp.,* 157 Fla. 349, 25 So.2d 864 (1946). The mistake must be mutual not unilateral. *Mills v Mills,* 339 So.2d 681 (Fla. 1st DCA 1976).

Many of the original grantors of the disputed quitclaim deeds are deceased. Those living grantors who testified in this action without exception said they did not think of any mineral rights at the time they signed the quitclaim deeds. Mr. Shell and Mr. Abbott, the two individuals who presented the quitclaim deeds on behalf of the county to the land owners, are deceased, and there is no evidence of their intentions at the time the documents were signed. Furthermore, there is no evidence of any agreement prior to the execution of the quitclaim deeds to which these deeds could be reformed.

There simply is no evidence of mistake either mutual or unilateral, or of any type of misrepresentation, to support a reformation. Since the testimony of the living grantors does not support reformation of their parcels of property, there can be no finding by this court of similar fact evidence of intent pursuant to Florida Statutes § 90.404(2)(a) (1989) relating to the deceased grantors to support reformation. Furthermore, there was no evidence that Mr. Shell or Mr. Abbott were agents of the State to reform on the basis of a fiduciary relationship.

No transaction relating to the property after the disputed quitclaim deeds were executed mentioned those quitclaim deeds. That fact cannot

104

be used to support the Defendants' proposition that none of the grantors intended to convey fee simple to the disputed land as the lack of recorded mention could be urged to deny any interest in the State or County. And it is obvious that the State and County have an interest.

This Court has carefully reviewed the Santa Rosa Circuit Court files of *N.L. Golden v Santa Rosa County,* case number 73-C-50 and *Willie Mae Thomas, G. Arthur Thomas et ux. v Santa Rosa County,* case number 73-C-51. There the trial judge allowed parol evidence on the issue of intent relating to the quitclaim deeds to Santa Rosa County. The factual scenario in that consolidated case is somewhat different from the case at bar as follows: agreements relating to some of the parcels were entered into between the governmental body and the property owners before the quitclaim deeds were executed, the chairman of the Board of County Commissioners signed a statement on each deed accepting that property for public use, and there was also reverter language in the operative resolution. Further, the time period between execution of the deeds and the institution of the lawsuit was relatively short. The long time period in this case, plus the fact that the property owners did not initiate this lawsuit, diminishes the Defendants' arguments. This court does not find persuasive the proposition that the *Golden* decision controls the decision in the pending case.

Thirty two years passed between the execution of the last disputed quitclaim deed and the institution of this law suit. No issue as to easement versus fee simple was ever raised by any of the property owners during that period of time. The later discovery of oil underneath the land should not be a factor in impeaching the transactions of the early 1950s.

All of the quitclaim deeds transferred fee simple to the State of Florida. There is no evidentiary support for reformation.

### B.

May a governmental entity constitutionally, through a quitclaim deed or as a consequence of maintenance and construction, acquire fee simple title to the real property under a road when all that is necessary for the public purpose to which the road will be put is an easement?

The necessity issue springs from cases in which a governmental entity exercises its power of eminent domain pursuant to Article X, section 6 of the Florida Constitution. However, this is a bargain and sale case, and there is no limitation, either constitutional, statutory or from common law, on the power of the State to acquire land in fee simple for road purposes. Florida Statutes § 341.42 (1953) very clearly

**105**

stated that the State Road Department "may purchase, lease, or otherwise acquire, any land and take a deed thereto in the name of the State of Florida."

The proper time to challenge the governmental body on the issue of necessity is at the time of acquisition. *Holland v State, supra.* In attacking the necessity of fee simple versus an easement for the purposes of building a road, Defendants presented no contrary evidence on the issue of necessity. Their argument is based solely on the common perception that mineral rights are not an essential component in building a proper road. The argument Plaintiffs make regarding the definition of the words "necessary" and "required" in statutory, deed, and governmental transaction language is persuasive. These words refer to the physical area needed for the road, not the size of the legal estate.

Therefore, the defense of necessity fails as it was not timely raised in relation to the transaction and it is not applicable to negotiated transactions.

## C.

Does the operation of the maintenance statute vest fee simple title in the State to those lands which are under the road but not addressed in the disputed quitclaim deeds?

The maintenance statute provides that whenever any governmental entity constructs a road and maintains that road uninterruptedly for a period of four years the road is dedicated to the public. In 1953, the maintenance provision was contained in Florida Statutes § 341.66 and stated in pertinent part that if the road were "a State Road all right, title, easements and appurtenances therein and thereto being the fee simple title to the extent in width that has been maintained" shall vest in the State Road Department.

A major revision of the transportation laws occurred in 1955 when the Florida Legislature adopted the Florida Highway Code. At that time, the maintenance statute was transferred to Florida Statutes § 337.31. The dedication language reads essentially the same except that the words "begin the fee simple title" were removed. The 1955 language remains essentially the same today, and the maintenance statute appears at Florida Statutes § 95.361 (1989).

Defendants argue that by removing the fee simple title language from the statute in 1955, the Florida Legislature intended to change the quality of the estate that the appropriate governmental entity would obtain through maintenance.

There is no dispute that initially the State, and subsequently the

106

County and the Town of Jay, have continuously maintained the road over the 50 foot stretch, and the 40 foot stretch on State Road parcels 25, 59 and 24. There was testimony that the adjoining property owners also maintained land up to the road surface itself, but this court finds that the State, from construction through reclassification in 1978, and the County thereafter until the present, maintained the road pursuant to statutory requirements.

There is a wide ranging body of case law interpreting this statute with case specific findings. Within the jurisdiction of the First District Court of Appeal, Plaintiffs argue that the decision is controlled by *Madden v Florala Telephone Company,* 362 So.2d 475 (Fla. 1st DCA 1978). Defendants urge that the controlling cases are *Lovey v Escambia County,* 141 So.2d 761 (Fla. 1st DCA 1962), and *Bonifay v Dickson,* 459 So.2d 1089 (Fla. 1st DCA 1984).

A careful reading of the *Lovey* decision could lead one to distinguish that case from the case at bar in that there were no facts before the *Lovey* Court that Escambia County was seeking fee title to the road in question. It can also be argued that this interpretation is purely legal hair splitting.

The facts in *Bonifay v Dickson* are distinguishable from the case at bar because the issue was not whether the maintenance statute vested title in the road, but rather the effect of the maintenance statute on land between the road and fronting on a body of water. The *Dickson* court held that the maintenance statute did not destroy the common law dedication of a road, a holding which has supported other decisions.

It is the construction and maintenance of a road which vests title in the governmental entity, whether or not a prior governmental interest in the road existed. The statute would be nonsensical if a common law dedication—which presumably occurs with the vast majority of roads in this state before they are improved—would operate to nullify the effect of the statute. In this case the map of the road was not filed with the Clerk of the Court pursuant to the statute. However, that omission does not negate the application of the statute, but only negates the prima facie evidence of ownership. By stipulation and other evidence here, necessary acts for the statute to be effective to transfer ownership to the government have been proved.

In *Madden v Florala Telephone Company,* the First District Court of Appeal clearly held that the statute vests fee simple title, not merely an easement, in a governmental entity. On its surface, *Madden* appears to conflict with *Lovey* while not expressly discussing the *Lovey*

decision. This Court will be bound by the later pronouncement of the First District Court of Appeal found in *Madden.*

Furthermore, this court is not persuaded by the arguments of Defendants regarding the constitutionality of the maintenance statute. The statute has been in existence for at least 38 years and has been challenged on a number of fronts. It still stands as valid law. This court will not presume to say otherwise. Therefore, by maintenance, fee simple title to all lands within the disputed right of way which were not addressed by quitclaim deed vested in the State of Florida within the statutory time frame and transferred to Santa Rosa County when the road was reclassified in 1978.

## D.

Both sides have raised issues of statute of limitations and laches against the other side.

The statute of limitation arguments would cut both ways and make a nullity of this litigation. For the defense of laches to prevail, there must be a demonstration that the opposing party has adversely changed his position. *Kent Insurance Co. v Estate of Atwood,* 481 So.2d 1294 (Fla. 1st DCA 1986). There has been no allegation nor proof of adverse change in either Defendants' or Plaintiffs' positions.

## E.

Does the marketable record title act cure any defects in the Plaintiffs' title to the disputed land? A subissue is whether or not the disputed quitclaim deeds may serve as roots of title. Pursuant to MRTA,

> Any title transaction purporting to create or transferring the estate claimed by any person which is the last title transaction to have been recorded at least 30 years prior to the time when marketability is being determined

is a root of title. Florida Statutes § 712.01(2) (1989). The issue is whether or not these quitclaim deeds purport to transfer the estate claimed. A mere quitclaim deed may not serve as root of title. *Wilson v Kelley,* 226 So.2d 123 (Fla. 2d DCA 1969). However, the quitclaim deed may serve as root of title if it is possible to determine from its language what interest the grantor had in the property described and therefore what interests the deed purported to convey.

The operative language in the disputed quitclaim deeds is "remise, release, quitclaim, and convey." Does the word "convey" modify these quitclaim deeds from mere to nonmere? A "mere" quitclaim deed does

108

not affirm that the grantor is actually seized of a particular estate which the deed purports to transfer. In opposition, a "nonmere" quitclaim deed affirms that the grantor seized the estate which the deed purports to convey.

*Wilson v Kelley, supra,* is an oft-cited case. The quitclaim deed there provided that the grantors "remise, release, and quitclaim . . . all the right, title, interest, claim, and demand which [the grantors] have in and to the following— . . . : an undivided one-half interest in (specified land]." *Wilson v Kelley,* 226 So.2d at 124. With the exception of the word "convey," the transfer language in *Wilson* is the same as the transfer language in all the disputed quitclaim deeds. Plaintiffs focus on a statement in the *Wilson* opinion that MRTA "is not concerned with the quality of the title *so long as the root purports to convey the estate claimed* (emphasis in original)." *Wilson* at 127. Defendants focus on the following language:

> On the other hand, a quitclaim deed can serve as a root of title if it evidences an intent to convey an identifiable interest in the land. *Wilson* at 128.

However, a quitclaim deed which

> merely provides that the grantors "remise, release and quitclaim all the right, title, interest, claim and demand, which the grantors have in and to Blackacre," . . . cannot serve as a root of title because it is unknown what "right, title, interest, claim, and demand" the grantors may have had in Blackacre. *Wilson* at 128.

The example given by the *Wilson* court as to language in a quitclaim deed which can serve as root of title is somewhat perplexing. After many readings of *Wilson v Kelley,* the undersigned judge believes the undivided one-half interest aspect of the transfer language is a significant factual predicate for that decision.

This court is persuaded that the language "remise, release, quitclaim and convey" in the disputed quitclaim deeds, together with the totality of the deeds, especially the specificity of the property descriptions, moves these disputed quitclaim deeds out of the mere category into the nonmere category. This decision is further bolstered by the opinion in *DeAntonio v DeAntonio,* 512 So.2d 1076 (Fla. 1st DCA 1987). There the court recognized that a person may convey via a quitclaim deed a specific interest in property.

MRTA declares a marketable title in every estate of record more than 30 years old and extinguishes all interests which are older than the root of that chain of title. The finding here that under MRTA the

109

disputed quitclaim deeds are a root of title does not address any of the exceptions to marketability in Florida Statutes § 712.03. Counsels' memoranda on that issue are unclear and jurisdiction will be reserved to address any exceptions under Florida Statutes 4712.03 (1989).

## IV. CONCLUSIONS

1. The "Quit Claim Deeds" do not create an easement, and do not have any reservations in the Grantors.

2. The Maintenance Statute, Section 341.59, Florida Statutes (1955), is constitutional and grants the Plaintiffs title in fee simple absolute to all of the "parcels" and "gaps" which are subject to this litigation and the road between them.

3. Title to all the parcels and gaps subject to this litigation, including the road between them and the underlying minerals, is quieted in the Plaintiffs subject to further ruling pursuant to paragraph 6.

4. Subject to the reservations in paragraphs 3, 5, and 6, title is quieted as follows:

Plaintiffs specifically hold fee simple absolute title to the following "parcels" and "gaps", as defined in these proceedings, on the bases provided herein:

### Parcel 20

The Plaintiffs have title to parcel 20, in fee simple absolute, based on: (1) good record title superior to the rights of any defendants and (2) by operation of the Maintenance Statute.

### Parcel 21

The Plaintiffs have title to parcel 21, in fee simple absolute, based on: (1) good record title superior to the rights of any defendant and (2) by operation of the Maintenance Statute.

### Parcel 22

The Plaintiffs have title to parcel 22, in fee simple absolute, based on: (1) good record title superior to the rights of any defendants, (2) by operation of the Maintenance Statute, and (3) by operation of the Marketable Record Title Act.

### Parcel 23

The Plaintiffs have title to parcel 23, in fee simple absolute, based on: (1) good record title superior to the rights of any defendant and (2) by operation of the Maintenance Statute.

110

## Parcel 24

The Plaintiffs have title to parcel 24, in fee simple absolute, based on: (1) good record title superior to the rights of any defendant and (2) by operation of the Maintenance Statute.

## Parcel 25

The Plaintiffs have title to parcel 25, in fee simple absolute, based on: (1) good record title superior to the rights of any defendants and (2) by operation of the Maintenance Statute.

## Parcel 28

The Plaintiffs have title to parcel 28, in fee simple absolute, based on: (1) good record title superior to the rights of any defendant and (2) by operation of the Maintenance Statute.

## Parcel 29

The Plaintiffs have title to parcel 29, in fee simple absolute, based on: (1) good record title superior to the rights of any defendant and (2) by operation of the Maintenance Statute.

## Parcel 30

The Plaintiffs have title to parcel 30, in fee simple absolute, based on: (1) good record title superior to the rights of any defendant and (2) by operation of the Maintenance Statute.

## Parcel 31

The Plaintiffs have title to parcel 31, in fee simple absolute, based on: (1) good record title superior to the rights of any defendant and (2) by operation of the Maintenance Statute.

## Parcel 32

The Plaintiffs have title to parcel 32, in fee simple absolute, based on: (1) good record title superior to the rights of any defendant and (2) by operation of the Maintenance Statute.

## Parcel 33

The Plaintiffs have title to parcel 33, in fee simple absolute, based on: (1) good record title superior to the rights of any defendant and (2) by operation of the Maintenance Statute.

## Parcel 34

The Plaintiffs have title to parcel 34, in fee simple absolute, based

on: (1) good record title superior to the rights of any defendant and (2) by operation of the Maintenance Statute.

## Parcel 38

The Plaintiffs have title to parcel 38, in fee simple absolute, based on good record title superior to the rights of any defendant, except for the tiny sliver on the southwesterly end caused by the fact that the west line of the Eula Subdivision is not the same line as the west line of Lot 1 of the McCurdy Subdivision. The Plaintiffs are vested with marketable record title, in fee simple absolute, in all of parcel 38, including this tiny sliver, by operation of the Marketable Record Title Act.

## Parcel 40

The Plaintiffs have title to parcel 40, in fee simple absolute, based on good record title superior to the rights of any defendant, except for the portion thereof lying within Lots 3, 4 and 9, Block 2, of McCurdy Subdivision. The Plaintiffs have title to parcel 40, in its entirety, in fee simple absolute, by operation of the Maintenance Statute.

## Parcel 46

The Plaintiffs have title to parcel 46, in fee simple absolute, based on: (1) good record title superior to the rights of any defendant and (2) by operation of the Maintenance Statute.

## Parcel 48

The Plaintiffs have title to parcel 48, in fee simple absolute, based on: (1) good record title superior to the rights of any defendant and (2) by operation of the Maintenance Statute, and (3) by operation of the Marketable Record Title Act.

## Parcel 50

The Plaintiffs have title to parcel 50, in fee simple absolute, based on: (1) good record title superior to the rights of any defendant, (2) by operation of the Maintenance Statute, and (3) by operation of the Marketable Record Title Act.

## Parcel 59

The Plaintiffs have title to parcel 59, in fee simple absolute, based on: (1) good record title superior to the rights of any defendant and (2) by operation of the Maintenance Statute.

## Parcel 116

The Plaintiffs have title to parcel 116, in fee simple absolute, based on: (1) good record title superior to the rights of any defendant and (2) by operation of the Maintenance Statute.

## Calfee Street Gap

The Plaintiffs have title to the Calfee Street Gap in fee simple absolute, based on: (1) good record title superior to the rights of any defendant and (2) by operation of the Maintenance Statute.

## Gap Between Parcel 32 and part of Parcel 40

The Plaintiffs have title to the Gap between Parcel 32 and part of parcel 40 in fee simple absolute, by operation of the Maintenance Statute.

## State Street Gap

The Plaintiffs have title to the State Street Gap in fee simple absolute, by operation of the Maintenance Statute.

5. This Court retains jurisdiction to hear and decide all other pending matters related to this case, being in part: an action for accounting, determination of court costs, entry of default judgments against those Defendants for whom clerk's defaults have been entered, and any further matters relating to the tax exception of MRTA.

6. Counsel shall submit within 20 days further argument via memoranda as to the effect of the tax exception of MRTA on the interest of the Plaintiffs. A partial summary judgment order will thereafter be entered.

7. Plaintiffs made no initial prayer for attorney's fees. Jurisdiction will be reserved to address the issue of entitlement to attorney's fees. Counsel are directed to *Stockman v Downs,* 16 FLW S160 (Fla. Jan. 31, 1991).

8. The Court also reserves jurisdiction to address Plaintiffs' entitlement to pursue a civil theft cause of action as well as punitive damages and prejudgment interest. Punitive damages were not plead nor can the undersigned judge locate within the voluminous court file the prayer or pleading relating to civil theft although an Order was entered allowing such.

Entered this 4th day of March, 1991.